NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

| | | |
|---|---|---|
| FRED PENA, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Case No. 2D13-3540 |
| | ) | |
| THE BOARD OF TRUSTEES OF THE | ) | |
| PENSION FUND FOR THE | ) | |
| FIREFIGHTERS AND POLICE | ) | |
| OFFICERS IN THE CITY OF TAMPA, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Opinion filed August 20, 2014.

Appeal from the Circuit Court for
Hillsborough County; Christopher C.
Sabella, Judge.

Michael B. Germain of Germain Law Group,
P.A., Tampa, for Appellant.

Stuart A. Kaufman and Paul A. Daragjati of
Klausner, Kaufman, Jensen & Levinson,
Plantation, for Appellee.


LaROSE, Judge.

Fred Pena, a retired Tampa firefighter, appeals a final summary judgment

entered in favor of The Board of Trustees of the Pension Fund for the Firefighters and

Police Officers in the City of Tampa ("Trustees").  Mr. Pena alleged that the Trustees

paid an incorrect interest rate on the delayed payment of a "13th Check" from the pension fund. More specifically, he alleged that when the Trustees delayed payment, they held the funds in a separate interest-bearing account. Upon payment of the "13th Check," the Trustees paid interest on those funds for the delay period at the separate interest-bearing account rate. Mr. Pena contends that he is entitled to the interest at the rate mandated in his pension contract, the net investment performance rate. For the reasons explained herein, we affirm.

Mr. Pena is a pension fund beneficiary. The Trustees administer the pension fund pursuant to Florida law and the terms of the pension contract. Mr. Pena participates in the Deferred Retirement Option Program ("DROP") established in Section 26 of the pension contract. Under DROP, an employee may retire for pension purposes but remain employed with the City. While still employed, monthly retirement benefits accrue in the employee's DROP account, together with the amount of any applicable cost of living adjustments, interest, and the amount of a "13th Check," if available. Upon termination of employment, the employee receives the funds accumulated in his or her DROP account.

The "13th Check" is a benefit created in Section 27 of the pension contract. The "13th Check" is a supplemental benefit program for eligible retired employees, including DROP participants. If certain financial and actuarial conditions are met as of September 30 of the pension fund's fiscal year, the Trustees pay a thirteenth pension check each year to eligible retirees. When a "13th Check" is paid to DROP participants, payment accrues to their DROP accounts, accumulating interest thereafter at the rate specified under the terms of Section 26 of the pension contract.

- 2 -

Section 27(B) of the pension contract reflects that the "13th Check" is an account within the pension fund.

The Trustees must establish the amount, if any, of the "13th Check" no later than May 31 of the following fiscal year, distributing payment no later than June 30 of the then current fiscal year. For the fiscal year ending September 30, 2005, the conditions precedent to the issuance of a "13th Check" were satisfied. Under normal circumstances, therefore, the Trustees would have set the amount of the "13th Check" by May 31, 2006, and would have made payment by June 30, 2006. Pending litigation against the Trustees, however, stalled their momentum. They delayed payment of the "13th Check" beyond June 30, 2006, but with good reason.

In the early 2000s, retirees challenged the Trustees' apportionment of investment losses among accounts within the pension fund. They sued the Trustees in what became known as the Maxey case. City of Tampa Retired Fire & Police Ass'n v. Bd. of Trs. of City Pension Fund for Firefighters & Police Officers in Tampa, 950 So. 2d 1242 (Fla. 2d DCA 2007). The trial court ruled in favor of the Trustees; the retirees appealed.

Although a "13th Check" for the fiscal year ending September 30, 2005, was otherwise payable to retirees, including Mr. Pena, the Trustees feared that an unfavorable appellate ruling would impact adversely the pension fund's actuarial certification. If the retirees won the Maxey case on appeal, the pension fund would not have made a sufficient actuarial gain to issue a "13th Check." Recouping paid-out funds would be difficult, if not near impossible. The Trustees decided to withhold payment of the "13th Check," placing the funds in a separate interest-bearing account, pending resolution of the Maxey case.

- 3 -

The Trustees advised the retirees and DROP participants of this decision. This notification provided ample time for participants to protest the decision, yet our record reflects no opposition. No one seems to contest that the Trustees had the discretion to take this action. Indeed, the trial court framed the issue as whether the Trustees acted within their authority when they decided to withhold payment. The trial court reasoned that paying the "13th Check" would have resulted in overpayment if the retirees were successful on appeal in the Maxey case. The Trustees would have faced liability for paying benefits prematurely. The trial court stated that the Trustees put the funds into a separate account to prevent market fluctuations that could have resulted in a loss of the "13th Check." The trial court found that the Trustees acted reasonably and in everyone's interests.

The Trustees eventually paid out the "13th Check" for the 2005 fiscal year after their success in the appeal of the Maxey case. Thus, the heart of this appeal involves the Trustees' decision to pay DROP participants, such as Mr. Pena,[1] the interest amount earned in the separate account in which the "13th Check" funds were placed rather than at the pension fund's higher net investment performance rate.

Mr. Pena argues that the pension contract dictated the interest rate payable on the "13th Check," that the Trustees lacked discretion to apply a different rate, and that the Trustees are estopped from applying a different rate. We review the final summary judgment de novo. See Major League Baseball v. Morsani, 790 So. 2d 1071, 1074 (Fla. 2001).

---

[1]Mr. Pena's amended complaint was filed on behalf of himself and others similarly situated. See Fla. R. Civ. P. 1.220. Our record does not disclose what, if anything, has occurred with respect to Mr. Pena's apparent desire to proceed on a class-action basis.

- 4 -

Section 26(D) of the pension contract describes the applicable interest rate for the funds that accumulate in the DROP accounts. The pension contract provides that "the DROP participant shall choose to have interest accumulate annually, whether positive or negative, at either (i) a rate reflecting the [pension] [f]und's net investment performance, as determined by the . . . Trustees, or (ii) a rate reflecting a low-risk variable rate selected annually by the . . . Trustees in [their] sole discretion." Sections 26(C) and (D) of the pension contract contemplate that the proper interest rate applies to funds that accumulate to the DROP accounts. The then-pending Maxey case presented an unanticipated wrinkle because the Trustees did not pay the "13th Check" for the 2005 fiscal year into Mr. Pena's account until after June 30, 2006.

Mr. Pena argues that Section 26 mandates that the interest rate must be the net investment performance rate. We disagree. A fair reading of Section 26 indicates that the selected interest rate applies only to funds that actually accumulate in the DROP account. The "13th Check" went into Mr. Pena's DROP account when the Trustees made payment after the conclusion of the Maxey case. At that point, the funds were subject to interest accumulation under Section 26. The Trustees acted in compliance with the pension contract in paying interest at the rate earned while the "13th Check" funds sat in a separate interest-bearing account.

Mr. Pena's contention that the Trustees are judicially estopped from applying a lower interest rate fares no better. Mr. Pena informs us that the Trustees took the position in Board of Trustees of City Pension Fund for Firefighters & Police Officers in Tampa v. Parker, 113 So. 3d 64 (Fla. 2d DCA) petition for review granted, 137 So. 3d 1021 (Fla. 2013), that the pension contract governs the proper interest amount for DROP participants. True. Mr. Pena posits further, however, that the

Trustees conceded in Parker that the amount of interest payable for delay in the issuance of a "13th Check" was at the pension fund's net investment performance rate. Mr. Pena urges too much. Judicial estoppel is an equitable doctrine used to prevent litigants from taking inconsistent positions in separate lawsuits. Blumberg v. USAA Cas. Ins. Co., 790 So. 2d 1061, 1066 (Fla. 2001). And, as even Mr. Pena acknowledges, the party to be estopped must have successfully maintained the allegedly inconsistent position in a prior judicial proceeding. Id. The Trustees' alleged concession in Parker has no place here.

Parker involved a retired firefighter, as a class representative, challenging the Trustees' refusal to distribute a "13th Check" for the fiscal year ending September 30, 2004. See 113 So. 3d at 66. To recoup actuarial losses incurred in the pension fund in 2001 and 2002, the Trustees decided not to pay. Eventually, the Trustees recognized that they should have issued the "13th Check" for the 2004 fiscal year. Id. Apparently, use of the funds to pay off prior year losses was inappropriate. Key to Parker was whether the Trustees could withhold a "13th Check" to recover those investment losses. According to Mr. Pena, for settlement purposes, the Trustees agreed to pay interest at the net investment performance rate to sums that were otherwise due and payable.

Here, we face a narrower issue, the applicable interest rate payable for the time "13th Check" funds had not accumulated in DROP accounts pending the resolution of the Maxey case. The Trustees resolved the Parker case and paid the funds owed to the eligible retirees. 113 So. 3d at 66. Significantly, the parties in Parker apparently stipulated as part of the settlement that for those individuals in DROP at the

time the "13th Check" was distributed, the funds accrued to their DROP accounts, accumulating interest at the pension fund's net investment performance rate.

The Parker case is fundamentally different than Mr. Pena's situation. Mr. Pena's case involves a "13th Check" for the September 30, 2005, fiscal year that was being withheld pending resolution of the Maxey case, an action neither party challenged. In the Parker case, the Trustees apparently conceded that they should have issued the "13th Check." The only factual similarity between these cases is that the Trustees made a discretionary decision not to issue a "13th Check." Yet in Mr. Pena's case, sound fiduciary reasons spurred the decision. Until resolution of the Maxey case, entitlement to the "13th Check" was not a foregone conclusion. In Parker, the funds were due and payable, not subject to a withholding. 113 So. 3d at 66. The Trustees cannot be judicially estopped from applying a different interest rate under the circumstances Mr. Pena presents. Moreover, the parties in the Parker case appropriately noted that the net performance investment rate applied to funds that accumulated in a retirement account, including those of DROP participants.

Having carefully reviewed the record before us, we affirm the trial court's decision that the Trustees acted within their discretion in withholding payment of the "13th Check" for the 2005 fiscal year pending resolution of the Maxey case. We must also conclude that the trial court was correct in finding that the Trustees properly paid interest for the withheld funds at the rate paid in the separate account where the funds were placed pending resolution of the Maxey case.

Affirmed.

VILLANTI, J., and DAKAN, STEPHEN L., ASSOCIATE SENIOR JUDGE, Concur.